UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

*(Filed Electronically)*

| | |
|---|---|
| KENDRICK WILSON )<br>)<br>    *PLAINTIFF* )<br>)<br>V. )<br>)<br>LOUISVILLE-JEFFERSON COUNTY )<br>METRO GOVERNMENT )<br>   527 W. Jefferson Street, 4th Floor )<br>   Louisville, KY 40202 )<br>)<br>-and- )<br>)<br>BRETT HANKISON, Individually and )<br>in his Official Capacity )<br>   633 W. Jefferson Street )<br>   Louisville, KY 40202 )<br>)<br>    *DEFENDANTS* ) | **COMPLAINT**<br><br>CASE NO.: 3:19-cv-739-CRS |

\*\*\* \*\*\* \*\*\* \*\*\*

    Comes the Plaintiff, KENDRICK WILSON (hereinafter "MR. WILSON"), by and through undersigned counsel, and brings this Complaint before this Honorable Court, which seeks damages for the violations of MR. WILSON's federal rights by the named Defendants, as well as damages for his state law causes of action.

    In support of his action thereof, the Plaintiff now hereby alleges the following:

**JURISDICTION AND VENUE**

    1.    This is an action for damages in excess of Fifteen thousand dollars ($15,000.00), exclusive of attorneys' fees, costs, and interest.

2. Plaintiffs' claims arise pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments of the United States Constitution, as well as under the statutory and common laws of the Commonwealth of Kentucky. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 over the § 1983 claims pursued herein.

3. This Court thereby has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims in this Complaint as they are so related to the claim or claims that form the basis of the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4. That venue is proper in this Court, being the Western District of Kentucky, pursuant to 28 U.S.C. § 1391.

5. All conditions precedent to the maintenance of this action have been performed or have occurred prior to the filing of this action.

**PARTIES**

6. MR. WILSON, is, and at all times relevant hereto has been, a lawful and physical resident of Louisville, Jefferson County, Kentucky in the United States of America.

7. At all times material hereto Defendant, LOUISVILLE - JEFFERSON COUNTY METRO GOVERNMENT (hereinafter "Defendant METRO"), is and has been, a political subdivision of the Commonwealth of Kentucky, organized and existing under the laws of the Commonwealth of Kentucky with a principle place of business located at 527 W. Jefferson Street, 4th Floor, Louisville, KY 40202.

8. At all times material hereto Defendant METRO, pursuant to Kentucky Revised Statute (KRS) 67C.101 has and does operate and control the Louisville Metro Police Department (hereinafter "LMPD"), its police officers, employees, agents, and representatives, including, but

not limited to, Defendant BRETT HANKISON (hereinafter "Defendant HANKISON"). Pursuant to KRS 67C.101, Defendant METRO GOVERNMENT is ultimately responsible for the training and supervision of the named individuals and responsible for the police policies described elsewhere in this Complaint.

9. At all times material hereto LMPD and its agencies, employees and agents were acting within the course and scope of their powers and/or employment. At all times material hereto, the agents of LMPD were responsible for the establishment of policies, either formally or by custom, regarding employment, training, retention. Supervision and conduct of Defendant HANKISON, and, additionally, were responsible for the employment, training, retention, supervision and conduct of Defendant HANKISON. Thus, the agencies, employees and agents of LMPD, and in turn Defendant METRO, were in their official capacity and vicariously viable for the tortious acts and omissions of Defendant HANKISON pursuant to KRS 70.040 and Jones v. Cross, 260 S.W. 3d. 343 (Ky 2008).

10. At all times material hereto, Defendant HANKISON is, and has been, a natural person, sworn by the Commonwealth of Kentucky with the ability to work as a police officer, and is, and has been, employed by LMPD as a sworn police officer. Upon information and belief, Defendant HANKISON engaged in and completed LMPD's police training academy and has been employed as a police officer with LMPD since at least 2002.

11. At all times material hereto, Defendant HANKISON was acting within the course and scope of his employment as an LMPD Detective and/or as an off-duty officer. Defendant HANKISON is being sued in his individual capacity, as well as in his official capacity for his actions as an officer for LMPD.

## GENERAL FACTS
### (APPLICABLE TO ALL COUNTS)

12. MR. WILSON is a 34-year-old, Ford employee and small business owner, whose fatal misdeed was attracting the unwanted and undeserved attention of LMPD Detective, Defendant HANKISON, who decided that MR. WILSON, for one reason or another, had to be engaging in illegal activity, and that he had to ensure his conviction.

13. MR. WILSON's interactions with Defendant HANKISON first began on March 19, 2016, when Defendant HANKISON arrested MR. WILSON at Tin Roof for a bar fight. Defendant HANKISON's citation of the arrest, which charged MR. WILSON with Assault in the second degree, reads:

> "Defendant was observed in a physical confrontation whereas victim shoved defendant to stop him from yelling in his face. Defendant then punched victim in the mouth with a closed fist, knocking victim unconscious…Defendant has a violent past and is clearly a danger and threat to the community. Defendant was banned from Tin Roof and Molly Malone's because of this incident…"

While MR. WILSON does have two misdemeanor convictions for assault, the offenses are from 2006 and 2009, and he has remained relatively out of criminal trouble since that time. Further, MR. WILSON acted in self-defense in this incident, making Defendant HANKISON's claims that MR. WILSON is a threat to the community baseless and unnecessary.

14. MR. WILSON was able to post his $500.00 bond the next day and be released. He further expended funds to hire legal counsel to defend him. This charge was ultimately dismissed in Jefferson District Court on November 15, 2016.

15. MR. WILSON had various interactions with Defendant HANKISON, including over a relationship with the same woman, however none lead to an arrest.

16. On June 2, 2018, however, MR. WILSON had another consequential run-in with Defendant HANKISON outside of the same establishment, Tin Roof, which lead to his second arrest by Defendant HANKISON.

17. MR. WILSON was walking on the sidewalk past Defendant HANKISON and the door of the establishment on the way to his vehicle. Then, as visible on Defendant HANKISON's body camera, HANKISON waived his hand and commanded MR. WILSON back over to him, an order which MR. WILSON willingly complied with. According to his citation, Defendant HANKISON claims that "K9 Franklin indicated on [Mr. Wilson's] left front jeans pocket for the presence of a narcotic odor H/M/CM." Body camera footage reveals the canine sniffing MR. WILSON but making no movements consistent with a training "alert" or "indication" which would indicate a "hit" for a narcotics drug dog.

18. After this sniff, which lacked the reasonable suspicion required to even conduct it, Defendant HANKISON asks to see MR. WILSON's pocket contents, which MR. WILSON shows him. Defendant HANKISON's citation claims that a scuffle then ensued, however, body camera shows that MR. WILSON then put the money back into his pocket and attempted to walk away when Defendant HANKSION grabbed him by the arm. MR. WILSON can be heard repeating Defendant HANKISON's name multiple times and stating that he "tried to show [him]." Defendant HANKISON continued to grab MR. WILSON's arms. Defendant HANKISON and other LMPD officers then appear to detain and arrest MR. WILSON without announcing that they were doing so. MR. WILSON repeatedly kept stating that he just was trying to comply with Defendant HANKSION's request to show him the contents of his pockets and that the money he had was from "cutting hair all day".

19. Defendant HANKISON then appears to "locate" alleged narcotics on the sidewalk feet away from where the altercation took place, as viewable from his body camera footage. He then jokes with other LMPD officers about "planting dope" when MR. WILSON expressed shock over the locating of these drugs, and that officers were claiming they were his. Defendant HANKISON makes further jokes about the amount of cash MR. WILSON had, claiming "business is booming today" with a laugh.

20. Also visible on the body camera is an unnamed civilian, who can be heard communicating with MR. WILSON that he saw an officer drop the drugs on the sidewalk before he retrieved them. The civilian stated he would find MR. WILSON and send a cellphone video to him which recorded the incident. Defendant HANKISON acknowledge that he heard this interaction.

21. MR. WILSON was placed under arrest and charged with Trafficking in a Controlled Substance, First Degree, First Offense (< 4 grams Cocaine), Tampering with Physical Evidence, and Resisting Arrest. On the way to booking Defendant HANKISON can be heard discussing his familiarity with MR. WILSON, his legal counsel, and other identifiers after MR. WILSON stated that he believed that Defendant HANKISON had a "vendetta" against him. He again made the joke that "business was booming" when MR. WILSON indicated that the cash he had was from his barbershop business. MR. WILSON can also be heard accusing Defendant HANKISON of being a "dirty cop" and threatened to "expose him" and Defendant HANKISON's responses are recorded as well.

22. MR. WILSON had to again spend a night in jail, post a $500.00 bond in order to be released from custody, and was required to pay an extensive amount of money for legal services to defend these baseless charges. Upon his release MR. WILSON also incurred the cost of drug

tests, which all yielded negative results, in attempts to support his claim that he is not involved with narcotics.

23. In a suppression hearing in Jefferson Circuit Court, Defendant HANKISON stated, under oath, that he did not call MR. WILSON over, but rather was flipping his watch. He also stated that MR. WILSON threw the drugs during the struggle, however, both of MR. WILSON's arms are clearly restrained in the body camera video footage.

24. To this day this matter remains pending before the Jefferson County Circuit Court, with a jury trial date schedule for 2020.

25. In September of 2018, MR. WILSON made a report with LMPD Internal Affairs about his beliefs that Defendant HANKISON was unfairly targeting him. MR. WILSON believes that the short conversation with Sergeant Trey McKinley was recorded, however he was advised to discontinue his complaint as his case was pending and he did not have legal counsel present.

26. Shortly after on October 14, 2018, MR. WILSON was at Sullivan's Tap House with friends and his girlfriend when he encountered Defendant HANKSION again. Defendant HANKSION's arrest citation that follows this event read:

> "Detective working off duty in full Class B uniform at Sullivan's Tap House. Detective was advised by owner that he had observed defendant inside of establishment near dance floor. Defendant had previously been banned from Tin Roof and Sullivan's due to previous arrest on 3/19/16 for Assault 2nd. Defendant was arrested again outside of establishment on 6/20/2018 for TICS 1st – Cocaine. Defendant returned to Sullivan's and was escorted off property again in the past few weeks and told if he returned he would be subject to arrest for trespassing. Defendant entered the establishment on today's date knowing that he was banned from the property by the owners and management. I observed defendant exit throughout the front door at listed time and he was taken into custody. Search incident to arrest revealed a large amount of US currency in his wallet and a large bag of powder cocaine in his inside front breast pocket of his jacket. The bag weighed an excess of 5

grams and is far more than a personal use amount. Defendant is a known cocaine trafficker to narcotics detective. WVS activated."

27. However, there are many inaccuracies and fallacies to Defendant HANKISON's citation. They are as follows:

   a. First, MR. WILSON contends that he has never been banned from Sullivan's Tap House or escorted from the property and that Defendant HANKISON would have no reason to believe as such. MR. WILSON even has cellphone video of him walking in the front door of Sullivan's Tap House the night before, where he is greeted by staff and allowed to skip the line. No one, including the officers present or management

   b. Next, MR. WILSON and the individuals with him all witness Defendant HANKISON watching MR. WILSON inside of Sullivan's at multiple points in the night and never trying to remove him until MR. WILSON was walking out on his own.

   c. As they were suspicious of Defendant HANKISON, a different cellphone video taken from the night of his arrest as the group was leaving. In it, Defendant HANKISON can be heard saying "Matt the one who just told me you were in here and to come get you." In preparing his defense for the criminal charges, MR. WILSON spoke to the owner of Sullivan's Tap House, Matt Taylor, (with whom he is personal friends with), who confirmed that he had never told Defendant HANKISON to remove MR. WILSON. Mr. Taylor also confirmed that they were aware of MR. WILSON's presence in the establishment on October 14, 2018. Further, he stated that he was aware that Defendant HANKISON has his own "ban list", but that is not related to their establishment.

    d. Additionally, MR. WILSON contends that Defendant HANKISON's citation stating that he had previously been banned from Tin Roof and Sullivan's due to previous arrest on 3/19/16 is false, as Sullivan's was not even open in 2016. Further, his 6/20/2018 arrest did not occur outside of Sullivan's Tap House as Defendant HANKISON claimed in the citation, but rather in front of Tin Roof, an establishment with different owners and management.

28. Further, civilian video was taken of the events that transpired during MR. WILSON'S arrest, which show Defendant HANKISON patting MR. WILSON down. He aggressively kicks MR. WILSON's legs apart when he began the pat down and held a walkie talkie in his hand during the search. He also had to search his jacket pocket twice before he "located" the suspected narcotics. Defendant HANKISON can also be seen on the same video taunting MR. WILSON's girlfriend, telling her to "put this on social media" and telling her that he was planting "dope" again.

29. MR. WILSON was for the third time required to spend a night in jail, post a $1,000.00 bond in order to be released from custody, and pay even more money for additional legal services to defend these charges.

30. The charges were eventually dismissed on December 10, 2018, in Jefferson District Court after laboratory testing revealed that the powder substance Defendant HANKISON claims to have located on MR. WILSON came back negative for any controlled substances.

31. MR. WILSON's cash and cellphone were also seized in this arrest and legal counsel had to be obtained in order to make a request before the Jefferson District Court to return it.

32. Finally, on October 1, 2019, narcotics officers requested Judge Susan Schultz-Gibson sign search warrants for MR. WILSON's home and business (The People's Barbershop).

They further requested an Order, sealing the supporting affidavits, until law enforcement actions "are completed."

33. LMPD narcotics officers arrived at MR. WILSON's place of employment, Ford Motor Company, where MR. WILSON was on the clock performing his duties. He was told by his supervisor to leave the floor and go to Labor Relations. Once in a room he was detained without explanation. MR. WILSON was taken to an unmarked car where he was told he was being detained pursuant to a search warrant. Officers asked him for his key to his Cadillac, which was at his house. Officers then drove him to the other side of Ford's parking lot, requested MR. WILSON's key to the vehicle parked there and searched that vehicle.

34. An LMPD officer then transported him to his barbershop, where he was met by other officers, who proceeded to search the shop for over an hour, with the assistance of police narcotics dogs. To MR. WILSON's knowledge nothing was taken from the shop. Officers also called law enforcement in Indiana and attempted to convince Indiana that MR. WILSON had violated an Emergency Protective Order that is in place there and to arrest him. They also stated that he should "call Rob Eggert" because they planned to arrest him the next day for a federal gun charge. Officers then let MR. WILSON go and left him at his shop.

35. While this was taking place, MR. WILSON's girlfriend, her young child, and his disabled adult sister were at MR. WILSON's residence when other officers arrived there and kicked the door in and pointed guns at his girlfriend. They then proceeded to handcuff her during the entirety of the search of the residence. During the search officers also stated to her that a narcotics dog had hit on MR. WILSON's Cadillac for drugs and threatened that if she did not tell officers what was in the vehicle that they would get Child Protective Services involved.

36. The executing narcotics officers conducting these searches tore apart MR. WILSON's home and business, destroying property. Walls, carpets and vents were destroyed, as well as food. Mr. Wilson has had to make various replacements, including a door to his home, which was destroyed.

37. The only items that officers seized were a legally registered handgun, MR. WILSON's ID and his cellphone.

38. MR. WILSON believes that, as Defendant HANKISON is a narcotics detective and they have a tenuous history, that it is reasonable to believe that he played a role in the issuance of these warrants, which were carried out by narcotics officers. Further, Officers told

39. As a result of the continuing unconstitutional and tortuous actions by the Defendants and/or their agents, MR. WILSON sustained serious and significant violations of his Constitutional rights.

### COUNT I: VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION THROUGH THE UNNECESSARY/EXCESSIVE USE OF FORCE
**(Against Defendant HANKISON in his Individual Capacity)**

40. Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

41. 42 U.S.C. § 1983 provides that:

> "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress..."

42. On October 14, 2018, Defendant HANKISON, acting under color of the law of the Commonwealth of Kentucky, and in the course and scope of his duties with the LMPD, unlawfully arrested MR. WILSON, which he did so knowing he did not have probable cause.

43. This arrest amounted to a constitutional deprivation of MR. WILSON's rights, privileges and immunities, as secured by 42 U.S.C. § 1983 and the Due Process clauses of the Fourth and Fourteenth Amendments to the United States Constitution.

44. Defendant HANKISON, a reasonable police officer, knew or should have known of MR. WILSON's Constitutional rights at the time of the complained of conduct as they were clearly established at that time.

45. In the course of their interactions, Defendant HANKISON, acting under the color of law, and in the course and scope of his duties with the LMPD, deprived MR. WILSON of his Constitutional rights by arresting him under knowingly false pretenses, even though he knew, or should have known, that such pretenses were unreasonable in light of the facts and circumstances as well as in violation of MR. WILSON'S rights.

46. MR. WILSON was not engaging in any criminal conduct. Therefore, he maintained his clearly established Constitutional right under the Fourth and Fourteenth Amendments to bodily integrity and to be free from unlawful arrests and searches by law enforcement.

47. That he knew MR. WILSON was not engaging in any criminal activity is indicative that Defendant HANKISON acted in a manner that was objectively unreasonable, intentional, reckless, deliberate, callously indifferent, wanton and/or malicious, and was indicative of a total and reckless disregard of and indifference toward the Constitutional rights of MR. WILSON.

48. Defendant HANKISON was consciously aware that his actions of an unlawful, and unreasonable arrest and search of MR. WILSON were not only in violation of MR. WILSON's

clearly established constitutional rights, but that they were likely to cause harm or injury to MR. WILSON's finances and reputation within the community.

49. Further, Defendant HANKISON's actions were carried out in such a manner and with such a significant amount of unnecessary excessiveness that it shocks the conscience, and unreasonably restrained MR. WILSON of his freedom.

50. As a direct and proximate result of the constitutional violations described herein and committed by Defendant HANKISON, MR. WILSON suffered financial loss, embarrassment, and harm to his reputation and business which have created damages in excess of the jurisdictional limits of this Court.

51. Defendant HANKISON is therefore liable in his individual capacity for his conduct, which resulted in MR. WILSON's unlawful arrest and search, as well as all damages sustained by the him.

52. The Plaintiff accordingly seeks damages including, but not limited to, compensatory and nominal damages, legal fees, destruction of earning capacity, mental pain and suffering, and punitive damages from Defendant HANKISON in his individual capacity.

**WHEREFORE**, the Plaintiff, KENDRICK WILSON, demands judgment against Defendant HANKISON in his individual capacity, for all damages, including costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

### COUNT II: VIOLATIONS OF 42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
(Against Defendant METRO)

53. Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

54. In order to establish a municipal liability under 42 U.S.C. § 1983, a Plaintiff must show that the alleged constitutional violation occurred because of a municipal custom or policy. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). That requisite showing can be made by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013).

55. Defendant METRO GOVERNMENT is liable for MR. WILSON's Constitutional violations under § 1983 based on the different theory of culpability that an official with final decision-making authority ratified illegal actions.

56. LMPD is an agent of Defendant METRO, meaning any actions or inactions by LMPD can be attributed and/or extended to Defendant METRO.

57. LMPD, and by virtue Defendant METRO, as an entity having final decision-making authority, ratified the consistent illegal actions of Defendant HANKISON, by failing to review complaints made against Defendant HANKISON and take appropriate action.

58. It is unknown to the Plaintiff how many complaints have been made against Defendant HANKISON over the course of his career, however, MR. WILSON has made no less than one complaint with Trey McKinley of Internal Affairs, which dated September of 2018. This complaint occurred just one month before the October 2018 incident at Sullivan's Tap House.

59. Therefore, LMPD, and as such Defendant METRO, had knowledge that such unconstitutional conduct was being carried out by Defendant HANKISON and subsequently failed

to conduct an investigation, indicating that they implicitly authorized, approved, or knowingly acquiesced the unconstitutional conduct of Defendant HANKISON.

60. Such a failure by Defendant METRO, or its agent LMPD, to meaningfully investigate MR. WILSON's complaint and issue recommendations as Defendant HANKISON or department policy as a whole is the moving force behind the violation of MR. WILSON's Constitutional rights.

61. As such, Defendant METRO is liable under § 1983 based on a deliberate indifference and patterned failure by its supervisors to meaningfully investigate prior allegations of unconstitutional conduct. Leach v. Shelby Cty. Sheriff, 891 F.2d 1241 (6th Cir. 1989).

62. Therefore, the Plaintiff has shown that the constitutional violation of MR. WILSON's rights occurred because an official with final decision-making authority ratified illegal action which knowingly caused federal rights violations. Said conduct makes Defendant METRO liable for MR. WILSON's damages.

**WHEREFORE**, the Plaintiff, KENDRICK WILSON, demands judgment against Defendant METRO, for all damages, including costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

## COUNT III: NEGLIGENCE
### (Against Defendant HANKISON)

63. Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

64. Pursuant to existing Kentucky common law including, but not limited to, Destock v. Logsdon, 993 S.W.2d 952 (Ky. 1999) and Grayson Fraternal Order of Eagles v. Claywell, 736 S.W.2d 328 (Ky. 1987), *"the rule is that every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury."* Further, Defendant HANKISON's

duties as a law enforcement officer are specifically and unambiguously defined by Kentucky statute and written LMPD policies, including but not limited to KRS 503.090 and the LMPD SOP manual.

65. Defendant HANKISON breached his duties owed to MR. WILSON under these laws, as described throughout this Complaint, by using an unreasonable exercise of his law enforcement powers to effectuate an unlawful arrest and search of MR. WILSON.

66. Defendant HANKISON's failure to comply with all applicable laws, regulations, rules, orders and policies was the direct and proximate result of MR. WILSON's economic and emotional injuries, therefore entitling him to recover his compensatory and punitive damages by virtue of KRS 446.070.

**WHEREFORE**, the Plaintiff, KENDRICK WILSON, demands judgment against Defendant HANKISON, for all damages including costs and reasonable attorneys' fees pursuant to KRS 411.130, and any other relief this Court deems just and proper.

### COUNT IV: INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant HANKISON)

67. Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

68. Defendant HANKISON owed a duty of care to MR. WILSON.

69. He breached that duty of care when he unlawfully and repeatedly violated MR. WILSON's Constitutional rights, thus failing to act pursuant to state and constitutional law and exercise due care in protecting MR. WILSON's rights. See Chestnut v. Commonwealth, 250 S.W.3d 288, 295 (Ky. 2008). (In a claim for emotional distress damages the plaintiff must present evidence of the recognized elements of a common law negligence claim: (1) the defendant owed

a duty of care to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury.)

70. The result of that breach of duty was severe and serious emotional injuries to MR. WILSON. See Osborne v. Keeney, 399 S.W.3d 1 (Ky. 2012) ("…to ensure claims are genuine, we agree with our sister jurisdiction, Tennessee, that recovery should be provided only for "severe" or "serious" emotional injury.").

71. MR. WILSON, a small business owner and prominent community member, has had to deal with serious emotional injuries. For example:

    a. He has endured significant and daily community scrutiny regarding these criminal allegations which he incurred as a result of the negligence of Defendant HANKISON and which has caused significant embarrassment and damage to his reputation in the community. This include people who witnessed him handcuffed in front of his business and being walked out of his other place of employment. He has lost clients who have heard about his arrest or haven't been able to reach him due to multiple of his cellphones being taken.

    b. His relationship with his children has been strained, as the mother of his children has expressed concern over his arrest. Her concerns, as well as missing multiple events with his children due to jail time and court dates have caused him great stress.

    c. Further, being a new member of his neighborhood, he has had to field questions from neighbors about the search.

    d. MR. WILSON has had to seek counseling to deal with his anxieties about being in public and scared of Defendant HANKISON arresting him again. Defendant

>>>HANKISON has repeatedly accosted him in public and claimed he was banned from other locations in St. Matthews, which has caused MR. WILSON to just avoid the area completely.

See Id. At 17 (A "serious" or "severe" emotional injury occurs where a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case. Distress that does not significantly affect the plaintiff's everyday life or require significant treatment will not suffice.).

**WHEREFORE**, the Plaintiff, KENDRICK WILSON, demands judgment against Defendant HANKISON in his individual capacity, for all damages, including costs and reasonable attorneys' fees pursuant to KRS 411.130, and any other relief this Court deems just and proper.

### COUNT V: MALICIOUS PROSECUTION
### (Against Defendant HANKISON)

72. Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

73. The Kentucky Supreme Court defined malicious prosecution in Martin v. O'Daniel, 507 S.W.3d 1 (Ky. 2016), stating that the elements are:

>>>(1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;
>>>(2) the defendant acted without probable cause;
>>>(3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;
>>>(4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and,
>>>(5) the plaintiff suffered damages as a result of the proceeding.

74. Here, Defendant HANKISON initiated a criminal proceeding on October 14, 2018, against MR. WILSON, without probable cause, as he had no reason to believe MR. WILSON was trespassing on Sullivan Tap Houses' property.

75. Defendant HANKISON did so with malice, as evidenced by his history of interactions with MR. WILSON, for the sole purpose of continued harassment of MR. WILSON and restriction of his Constitutional rights.

76. The proceedings were terminated by a dismissal of the charges against MR. WILSON by a judge in Jefferson District Court on December 10, 2018.

77. MR. WILSON suffered financial damages, including but not limited to the incurring legal fees, as a result of this proceeding.

**WHEREFORE**, the Plaintiff, KENDRICK WILSON, demands judgment against Defendant HANKISON in his individual capacity, for all damages, including costs and reasonable attorneys' fees pursuant to KRS 411.130, and any other relief this Court deems just and proper.

**WHEREFORE**, the Plaintiff, KENDRICK WILSON, now respectfully demands this Honorable Court grant him the following relief from the Defendants:

1. Judgment against all Defendants in an amount calculated to fairly and reasonably compensate the Plaintiff, KENDRICK WILSON for the damages he has sustained;

2. Nominal, compensatory and punitive damages against each Defendant;

3. Pre-judgement and post-judgement interest;

4. Their costs and expenses herein expended, including reasonable attorney fees pursuant to 42 USC § 1988 and KRS 411.130;

5. Trial by jury on any and all issues so triable; and

6. Any and all other relief to which the Plaintiff may otherwise be properly entitled.

Respectfully submitted,

   /s/ Ashlea N. Hellmann_____
   /s/ Maria A. Fernandez_____
Ashlea N. Hellmann
María A. Fernández
FERNANDEZ HAYNES & MOLONEY PLLC
401 West Main Street, Suite 1807
Louisville, Kentucky 40202
Phone: (502) 589-1001
Fax: (502) 589-7333
ahellmann@fhmlegal.com
mfernandez@fhmlegal.com

## CERTIFICATE

This is to certify that a copy of the foregoing motion was sent via certified mail to the following parties, on this the 11th day of October 2019:

Louisville-Jefferson County Metro Government
527 W. Jefferson Street, 4th floor
Louisville, KY 40202

Detective Brett Hankison
633 W. Jefferson Street
Louisville, KY 40202

   /s/ Ashlea N. Hellmann_____
Ashlea N. Hellmann